**JAMES R. FROCCARO, JR.**
**Attorney at Law**
**20 Vanderventer Avenue, Suite 103W**
**Port Washington, NY 11050**
**telephone: (516) 944-5062**
**fax: (516) 944-5066**
**email: JRFESQ61@aol.com**

November 29, 2011

BY ECF
Hon. Carol B. Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  United States v. Matthew Rinaldo
11 Cr 783 (CBA)

Dear Chief Judge Amon:

I am the attorney for Matthew Rinaldo.  Mr. Rinaldo was recently arrested and charged in a Complaint with a Hobbs Act robbery as well as using and carrying a firearm in relation to that crime.  See ECF Docket #1. The Complaint alleges that in the year 2009, Mr. Rinaldo and others participated in the robbery of an illegal gambling parlor affiliated with the Bonnano Crime Family - and no one was harmed.  Mr. Rinaldo was subsequently indicted for these crimes in a case that has now been assigned to Your Honor.

Mr. Rinaldo is not alleged to have been present or armed during the robbery.  Rather, he is alleged to have been outside and acted as a getaway driver.  When Mr. Rinaldo was approached by the DEA nearly a

1

year ago, and told that he was a suspect in this robbery, he is alleged to have consented to a search of his person and the vehicle he was driving. No weapon was found and he was let go.  Mr. Rinaldo also has no criminal history evincing the prior use of a firearm and he has never ever been found in possession of a firearm by the authorities.

The weight of the evidence against Mr. Rinaldo in the case is not strong.  Upon information and belief, there are no tape recordings or forensic or physical evidence linking him to a robbery.  The evidence against him apparently consists of allegations made by two (2) cooperating witnesses seeking leniency for a host of their own crimes. And, one of the cooperating witness has previously stated that does not remember whether the person he met on the night of the robbery was named "Will or "Matt."  See Complaint at paragraph 8 and fn.3.  And, the other cooperating witness claims that he when he met he first met "Matt," he had been recently released from prison.  Id. at paragraph 10. Mr. Rinaldo, however, has never been in prison.

Mr. Rinaldo is also not alleged to be a made member of any organized crime group, let alone, supervisor others.

Before I was substituted as the attorney of record for Mr. Rinaldo, a bail application was made on his behalf before Magistrate Judge Go. This application was denied on the grounds that he posed a danger to the community.[1]  I have ordered and attached hereto for Your Honor's review, a copy of the transcript of the proceedings held before Magistrate Go on November 14, 2011.

By this letter, I am respectfully asking Your Honor to release Mr. Rinaldo on a substantial and restrictive bond.  Significantly, the U.S. Pretrial Services Office has recommended to the Court that Mr. Rinaldo be released on a substantial bond signed by three (3)

---

[1] The government conceded in the context of the prior proceedings before Magistrate Go that Mr. Rinaldo is not a risk of flight.

financially responsible sureties with the following conditions:

> 1) that he be subjected to pretrial supervision;
> 2) that his travel be restricted to the EDNY and SDNY;
> 3) that he surrender his passport, if any, and also not apply for a new passport;
> 4) that he be subject to random home visits; and
> 5) that he be placed on house arrest with electronic monitoring, except for attorney visits, court appearances, medical treatment and religious services.

Likewise, I am asking that Your Honor release Mr. Rinaldo on a substantial and restrictive bond. Namely, a $1 million Appearance Bond with all of the restrictive conditions recommended by Pretrial Services, but with the condition that the bond will be signed by eleven (11) financially responsible sureties, <u>not</u> just three (3) as recommended by Pretrial Services.[2] And, additional conditions being offered to secure Mr. Rinaldo's release are that his electronic monitoring bracelet be equipped with a GPS monitoring system, and that his fiancé's father, Carlos Acevedo, will pledge as collateral for the bond, his residence located at 512 Drumgoole Road West in Staten Island, New York, which has about $100,000 in equity.

If Mr. Rinaldo is released on bail, he will be residing with his fiancé, Candice Gutkais, at 41-93 Amboy Road in Staten Island, New York, along with their infant child, as well as Ms. Gutkais' child from a prior marriage who suffers from cerebral palsy - both of whom Mr. Rinaldo helps to care for at home. For Your Honor's information, Mr. Rinaldo who suffers from a debilitating back injury, has been unemployed since the year 2009 and receives Social Security Income. That is why the home where he resides, along with his fiancé and the children, is presently in foreclosure. There is no wealth here, unexplained or otherwise.

---

[2] All of the eleven (11) proposed sureties have previously been interviewed and approved by the government.

I respectfully submit that this combination of factors and conditions will reasonably assure the safety of the community and also serves to rebut the presumption in this case.[3]

For all of the foregoing reasons, I am respectfully asking that Mr. Rinaldo be ordered released on bond.

Respectfully submitted,

/JRF/

James R. Froccaro, Jr.

JRF:tp

---

[3] I am aware that Your Honor will review this bail application *de novo*. However, during the prior detention hearing, Magistrate Judge Go did initially state on the record that "I don't find clear and convincing evidence of dangerousness now to the community that can't be addressed by subjecting the defendant to home detention with electronic monitoring and placing limitations on the people he can associate with." See transcript at 14 (emphasis supplied). But, when told by the government that the presumption applied, Magistrate Go responded "If the presumption applies, then my view might be different, but without the presumption I stand by what I said earlier." Id. at pages 14 and 18 (emphasis supplied). Whether the presumption applies, however, is of no consequence. The burden of proof remains the same - that the government must prove by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community in Mr. Rinaldo's particular case. See 18 U.S.C 3142.

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

2

3    ------------------------------X
                                 :
4    UNITED STATES OF AMERICA,    :
                                 :    11-M-1053 (RER-1)
5             v.                  :
                                 :    November 14, 2011
6    MATTHEW RINALDO,             :    Brooklyn, New York
                                 :
7                   Defendant.    :
                                 :
8    ------------------------------X

9

        TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
10           BEFORE THE HONORABLE MARILYN D. GO
              UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

14   For the Government:        UNITED STATES ATTORNEY
                                BY:  NICOLE ARGENTIERI, ESQ.
15                              ASSISTANT U.S. ATTORNEY

16

17   For the Defendant:        MATTHEW SANTAMAURO, ESQ.

18

19

20   Court Transcriber:        MARY GRECO
                                TypeWrite Word Processing Service
21                              211 N. Milton Road
                                Saratoga Springs, NY 12866
22

23

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1          THE CLERK:  Criminal Cause For a Detention hearing,

2  USA v. Matthew Rinaldo, 11-M-1053.  Counsel, your name for the

3  record?

4          MS. ARGENTIERI:  Nicole Argentieri for the United

5  States.  Good morning, Judge.

6          MR. SANTAMAURO:  Good morning, Your Honor.  Matthew

7  Santamauro for Matthew Rinaldo.

8          THE COURT:  Good morning, counselors.  Good morning,

9  Mr. Rinaldo.

10          THE DEFENDANT:  Good morning, Your Honor.

11          THE COURT:  This matter is on for a bail hearing.

12          MS. ARGENTIERI:  Yes, Judge.

13          MR. SANTAMAURO:  Yes, Judge.

14          MS. ARGENTIERI:  It really is the first --

15          THE COURT:  Application?

16          MS. ARGENTIERI:  Yes.

17          MR. SANTAMAURO:  It is.

18          THE COURT:  I see.  I see from checking the docket

19  sheet.  Now, what is the Government's position?  Are you

20  seeking detention on risk of flight or dangerousness or both?

21          MS. ARGENTIERI:  Judge, I would have said on both

22  grounds but after meeting the sureties that are here today I

23  would say that we're solely seeking his detention based on

24  danger to the community based on the nature of the crimes that

25  are charged and his recent activity.

3

1          THE COURT:  I'll hear you.

2          MS. ARGENTIERI:  Okay.  Judge, just to start with the

3   charges in this case, the defendant is charged with Hobbs Act

4   robbery and conspiracy.  It was actually a carried out robbery,

5   Judge, that occurred in 2009 where this defendant, along with

6   Bonanno associate Hector Pagan and several other individuals

7   went to an illegal gambling club in Staten Island, New York.

8   They went there armed and they went there to rob the club, and

9   they did so.  They were hoping to get large amounts of money

10  and jewelry.  They put everyone up against the wall, they

11  brandished the guns.  The defendant participated in this very

12  violent robbery.

13          No one was actually hurt, Judge, but there was the

14  possibility that someone could be hurt whenever there are guns

15  involved.  And it is that gun charge that gives rise to

16  presumption in this case.

17          THE COURT:  Okay.  It wasn't clear to me that the

18  defendant had any role in the actual robbery other than as a

19  driver.

20          MS. ARGENTIERI:  He was the driver, Judge, but he was

21  in the car with them, he helped them plan it, he drove them to

22  the actual robbery location, and he saw that they were armed.

23  And this was in 2009.

24          More recently, Judge, former Bonanno Family

25  consigliere, Anthony Graziano, was recently released to a

4

1  halfway house.  The terms of his stay at the halfway house are

2  that he's only to leave to go to pre-approved doctors visits

3  and possibly home for the weekend.

4        This defendant has been driving Mr. Graziano around

5  and has been helping him evade the conditions of his release,

6  Judge.  That is why the Government submits that home detention,

7  electronic monitoring, those types of measures are not

8  appropriate here where this defendant is engaging in

9  sophisticated means to allow Mr. Graziano to meet with the

10  Bonanno Family leadership, Judge.  And the DEA was able to

11  surveil such a meeting on October 18th, you know, just less

12  than a month ago.  I can hand up these pictures.  They're my

13  only copy.  I'm sorry.  I can show them to Mr. Rinaldo.

14        MR. SANTAMAURO:  May I see them?

15        MS. ARGENTIERI:  But it shows the street boss of the

16  Bonanno Family, Vinny TV; Bonanno soldier, Vito Balsamo;

17  Bonanno Family soldier Art Tarzia [Ph.], they're all meeting at

18  Mike's Place Diner.  And here is the defendant driving Mr.

19  Graziano.  I can pass up these pictures, Judge, if you think

20  they would be helpful.  But it's this type of behavior that

21  makes bail in this case inappropriate for a defendant like

22  this.

23        In addition, the agents did a search of phones that

24  were recovered when this defendant was arrested and the phone

25  numbers for Mr. Graziano, his very close criminal associate

5

1   Hector Pagan, and others are in his phone, Judge.

2           THE COURT:  Now, what's Anthony Graziano's position

3   in the Bonanno Family?

4           MS. ARGENTIERI:  I believe he's currently held as a

5   captain, Judge.  Before he went to prison he was acting

6   consigliere.

7           THE COURT:  Let me just clarify.  When you say he was

8   observed driving, were his activities driving solely to drive

9   Mr. Graziano to medical appointments?

10          MS. ARGENTIERI:  No, he drove him to that meeting,

11  Judge.

12          THE COURT:  Oh, to the meeting.  I'm sorry.

13          MS. ARGENTIERI:  He's there in the picture.  I can

14  show you.

15          THE COURT:  Oh, okay.

16          MS. ARGENTIERI:  I should have marked them.  So this

17  is Bonanno soldier Art Tarzia, Vinny TV.  That's the defendant

18  right behind them.  You can see they're leaving the diner after

19  the meeting.  That's Anthony Graziano.

20          THE COURT:  Okay.

21          MS. ARGENTIERI:  He had driven him that day.

22          THE COURT:  Okay.

23          MS. ARGENTIERI:  In addition, Judge, the Government

24  has source information that this is a defendant who makes money

25  by selling drugs and doing robberies, Judge, like the one that

6

1  was described in the complaint.  And the one thing that I found
2  very notable is that this defendant is unemployed.  He is
3  disabled and he has no job, which leaves the question as to how
4  he supports his family and how he lives day to day.  And it's
5  the Government's position that all of those facts point to the
6  fact that he makes his money through criminal activity and that
7  he is a risk and danger to the community and he should be
8  remanded.
9           THE COURT:  Remain in custody.
10          MS. ARGENTIERI:  Yes.  Remain in custody.  Sorry,
11  Judge.
12          MR. SANTAMAURO:  May I, Judge?
13          THE COURT:  Go ahead.
14          MR. SANTAMAURO:  Thank you very much, Your Honor.
15  Your Honor, with respect to -- I'm going to address the
16  photographs and the Graziano matter first and then I'll
17  proceed.
18          With respect to the photographs, Judge, Mr. Rinaldo
19  does not deny knowing Anthony Graziano.  In fact, he's known
20  Anthony Graziano's family, and I say family in the actual
21  family sense, for quite some time having had a relationship
22  with his daughter so many years ago.  Mr. Graziano had been
23  incarcerated for approximately nine years, ten years, so I
24  don't see any connection, criminal connection between Mr.
25  Graziano and Mr. Rinaldo.

1          Mr. Rinaldo does in fact drive Mr. Graziano to and

2    from his doctors' appointments which as Ms. Argentieri said is

3    one of the reasons why Mr. Graziano is allowed to leave his

4    house, perhaps the only reason.  That day, the day that the

5    photographs were taken, I'm informed that Mr. Graziano had

6    appointments with Dr. John Zafarino [Ph.] Safano [Ph.], Mr.

7    Hoffman and a physical therapist as well and that this was a

8    lunchtime meal that occurred at the diner on Staten Island.  So

9    Mr. Graziano was in fact doing what he was supposed to do.

10   They stopped for lunch, they got something to eat, and then

11   they went home.

12          I don't know that there's any evidence that my client

13   knows who the other individuals are in the photograph.  I don't

14   know that he would even know all of the conditions of Mr.

15   Graziano's release.  So the fact that the assertion was made

16   that he is helping Mr. Graziano evade his conditions of his

17   release, I don't know that that is appropriate here.  He would

18   have to have known what Mr. Graziano's conditions of his

19   release were for him to intentionally attempt or help him evade

20   what he's supposed to be doing.  So Your Honor, I don't believe

21   that that assertion can be made or substantiated.

22          With respect to drugs, he's not charged here with

23   drugs.  There were no drugs on him when he was arrested.  There

24   were no search warrants done on his house.  There's no evidence

25   that he is in fact a drug dealer.  He is living in his house

8

1   that is owned by his wife, that they are having a difficult

2   time making payments on.  He's on the verge of foreclosure

3   actually although they've managed to hold off on the

4   foreclosure.  His wife's family assists them as well.  Judge,

5   there are about 12 people outside that have become Matthew's

6   family.  So he is attempting to obtain disability benefits so

7   he could help support his family.

8           He has a son 11 months old with Candice Gutkis [Ph.]

9   his live-in, I call her his common law spouse.  He has another

10  son as well.  Candice has a disabled boy.  She is essentially

11  providing him with a place to live.  That's the way it's

12  working out between them.

13          Judge, with respect to him being a danger, please

14  consider also the complaint that's before you.  It's not an

15  indictment.  There is no evidence that Mr. Rinaldo was inside

16  the club.  There is no evidence that he had a weapon.  I

17  submit, Judge, there's no evidence that he knew there was a

18  weapon involved.

19          As far as him planning, it is alleged in the

20  complaint that the cooperating witness number one advised the

21  agent that coconspirator number one informed him and the other

22  coconspirators about a card game run by the Bonanno Family.  It

23  doesn't say here anywhere that Mr. Rinaldo planned it and Mr.

24  Rinaldo knew about the card game, that Mr. Rinaldo even knew

25  where they were going.  This is a loose relationship at best

9

1   between the cooperating witnesses and Mr. Rinaldo.

2        Judge, I don't believe that -- there were no

3   injuries.  That's been established.  I don't know that there

4   was ever a police report in this case.  I don't know that there

5   was ever a 911 call in this case.  There certainly were no

6   weapons recovered.  The only evidence that I suspect that the

7   Government has is cooperating witness number one and

8   cooperating witness number two.

9        And it's also my understanding that they have been in

10  custody since sometime in 2010.  I would suggest, Judge, that

11  the agents knew about this crime for more than a year and a

12  half and let Mr. Rinaldo be out on the street during this

13  period of time.  If he was a danger to the community, Judge,

14  why would he not have been picked up much sooner than he was?

15  They had the opportunity.  If they know who he is, they had the

16  opportunity to pick him up much earlier at a much earlier time.

17  He could have been picked up if he was a danger to the

18  community as the Government said.

19          THE COURT:  All right.  Okay.

20          MR. SANTAMAURO:  Judge, as far as risk of flight, I

21  believe the Government understands and said as much, he does

22  have a number of people here --

23          THE COURT:  Okay.  You don't need to address that

24  issue.

25          MR. SANTAMAURO:  Thank you, Judge.

1          He does have a criminal record.  His criminal record

2  is not one of violence.  He is not on probation.  He was not on

3  probation.

4          THE COURT:  There was an assault charge.

5          MR. SANTAMAURO:  An assault charge, yeah, I can

6  proffer -- I represented him on that in Richmond County

7  Criminal Court and that was a dispute with an ex-girlfriend's

8  father.  My contention in that case was he was just as much a

9  victim as he was a perpetrator in that case.  That was a

10 misdemeanor count, it was not a felony.  That case was

11 resolved.

12         THE COURT:  So how long has he been with his current

13 paramour?

14         MR. SANTAMAURO:  Approximately four years, Judge.

15         THE COURT:  Anything else?  What's his disability?

16         MR. SANTAMAURO:  He has back injuries but perhaps

17 more relevant he has a hearing disability in both of his ears.

18 He has diminished hearing capacity.

19         THE COURT:  That's a congenital defect?

20         MR. SANTAMAURO:  Judge, he was born with the hearing

21 defect.

22         THE COURT:  All right.

23         MR. SANTAMAURO:  He worked until approximately 2007.

24         THE COURT:  Okay.  Do you have any response, Ms.

25 Argentieri?

1          MS. ARGENTIERI:  Yes, Judge, just that first of all,

2     the Government is entitled to proceed by proffer under very

3     well established case law at these hearings.

4          THE COURT:  I don't think there's a huge dispute over

5     the facts that you proffer.

6          MS. ARGENTIERI:  Well, Mr. Santamauro seemed to call

7     into question whether or not there would be any evidence that

8     the defendant knew what he was doing when he went to go to the

9     robbery and he had participated in the plan.  And the

10    Government is making very clear that there are witnesses that

11    say that he participated in the planning of the robbery, that

12    he knew where they were going, and that he saw that the people

13    in the car were armed.  Those are facts that Mr. Santamauro

14    might dispute, but there are certainly witnesses that would say

15    that.

16         Judge, I'm just being informed, and I don't have this

17    with me, that sometime in 2010 there was also information

18    provided to local law enforcement that the defendant had

19    possessed a gun at that time but it was not recovered.

20         Also, I was unclear.  What is his disability that's

21    keeping him from working right now?

22         MR. SANTAMAURO:  He has a hearing disability.

23         MS. ARGENTIERI:  And then?

24         MR. SANTAMAURO:  A back injury.

25         MS. ARGENTIERI:  From 2007?  That's what's keeping

1   him from working in construction?

2          MR. SANTAMAURO:   Debilitating injury.

3          MS. ARGENTIERI:   Debilitating.   Okay.   So Judge,

4   since the last time -- my understanding of what was just said

5   is that the last time that he worked was in 2007 for

6   construction.   I think that begs the question how has he been

7   supporting himself if he's not on disability, Judge?   And I

8   think it supports the Government's case that he's been making

9   money through criminal activity, some of it dangerous criminal

10  activity such as the robbery that is detailed in this

11  complaint.

12          In addition, these two cooperating witnesses

13  participated in another robbery, really a burglary, Judge, with

14  this defendant where they went to so someone's house and I

15  think they were looking for money and it turned out that there

16  was no one home, so it's just a burglary.   But --

17          THE COURT:   When was that?

18          MS. ARGENTIERI:   That was also -- it was shortly --

19  it was either shortly before this robbery or shortly after it,

20  Judge.   They were around the same time.   I can't recall right

21  this instant.

22          In addition, the notion that Mr. Rinaldo drover Mr.

23  Graziano to meet with the street boss of the Bonanno family and

24  is in a picture walking out with him and that we're all

25  supposed to be naive and believe that he didn't know who Mr.

1  Graziano was meeting with is absurd.  It's absurd.  I mean if

2  you look at this picture, Judge, these are not ordinary

3  everyday people.  There is no way that he drove Mr. Graziano to

4  this meeting, went into the diner with them, and came out and

5  didn't know what he was doing.

6      THE COURT:  What time was that picture taken?

7      MS. ARGENTIERI:  What time?  Early afternoon.

8      THE COURT:  Okay.

9      MS. ARGENTIERI:  So while he may have driven him to

10  the doctor that day, he also drove him to meet with his

11  criminal associate.  For those reasons, we believe he should be

12  held pending trial.

13      MR. SANTAMAURO:  Just in response, Judge, once again,

14  he would have to know what Mr. Graziano's terms and conditions

15  are for him to intentionally attempt to evade Mr. Graziano's

16  release.

17      Judge, I just would also like to point out that with

18  respect to the planning, one of the complaining witnesses,

19  excuse me, one of the cooperating witnesses indicated in the

20  complaint that he had met Mr. Rinaldo that night.  And further,

21  that he wasn't even certain that his name was Matt.  He said

22  his name could have been Will.  That's in a footnote on Page 5

23  of the complaint.  So Judge, I don't believe the case the

24  Government has against Mr. Rinaldo in this case is particularly

25  strong and I think that's a factor to consider before holding

14

1  him in.

2          THE COURT:  I have to say these cases involving

3  charges that a defendant is associated with an organized crime

4  family pose particular difficulties.

5          In this case, I am not -- I don't find clear and

6  convincing evidence of dangerousness now to the community that

7  can't be addressed by subjecting the defendant to home

8  detention with electronic monitoring and placing limitations on

9  the people he can associate with.

10          MS. ARGENTIERI:  But Judge, in a case charging a

11  924(c) he's presumed, and the Government has to support it,

12  he's presumed to be a danger to the community and it's up to

13  the defendant to rebut that.  And by simply saying -- and

14  that's the standard in a case where a 924(c) is alleged.  And

15  simply saying, you know, without any support for it that he

16  didn't know what he was doing when he drove him to meet these

17  high ranking Bonanno guys and disregarding the rest of it,

18  including the fact that there's a gun involved here, Judge, and

19  we have photos.  I mean if we didn't have these photos, I have

20  no doubt that Mr. Santamauro would be standing up here saying

21  that it didn't happen.  But we have photos.  And I don't think

22  that given, respectfully Judge, I don't think that given the

23  standard where he's presumed to be a danger to the community

24  that what Mr. Santamauro has said here today rebuts that

25  presumption.

1          THE COURT:  What was Mr. Graziano incarcerated for?

2          MS. ARGENTIERI:  Racketeering conspiracy, Judge,

3    including predicate acts of murder conspiracy.

4          MR. SANTAMAURO:  Mr. Rinaldo was not part of that

5    conspiracy.  He was not part of that indictment.  Was not

6    charged in any way, shape or form with any of the crimes that

7    Mr. Graziano has been accused of in the past.

8          As far as rebutting the presumption, Judge, all of

9    the factors that I discussed are the factors to be considered

10   under 3142(g).  Judge, I have also again, his family is here.

11   His family is here to assure, in some way, assure the Court

12   that they will be responsible for him with respect to making

13   sure he's not a danger to the community, that if he is on home

14   detention, he does have a restriction of who he can see.

15         MS. ARGENTIERI:  Judge, respectfully, the people in

16   the courtroom are not his family.  They're people who are

17   related to his girlfriend.  And there are a lot of them and I

18   thought it was a very impressive show of support, but they're

19   not people that are actually this defendant's family.

20         In addition, there's case law that says that the

21   amount of a bail package -- I can get you this case, Judge --

22         THE COURT:  No, I'm not going -- I don't think it's

23   appropriate to equate the adequacy of a bail package with a

24   determination of dangerousness.

25         MS. ARGENTIERI:  And the crime that he's charged

16

1   with, robbing an illegal gambling club around the Bonanno

2   Family, Judge, that shows the association with organized crime

3   that this defendant has.  I mean --

4           MR. SANTAMAURO:  Well Judge, with respect to that,

5   there's no allegation as to who was robbed.  We don't even know

6   who was at the card game.

7           MS. ARGENTIERI:  And that along with the fact that

8   there was no police report and no 911 call, really?  An illegal

9   gambling club in Staten Island is going to be robbed at

10  gunpoint by other mob associates and call the police?  My watch

11  was stolen?  My money was taken?  That just shows the absurdity

12  of the defense's argument.

13          MR. SANTAMAURO:  And the only way we know that is by

14  cooperating witnesses who are known robbers who have robbed

15  numerous people who don't know even when this robbery was

16  committed and I would submit they probably don't know where.

17          MS. ARGENTIERI:  That I can tell you is not true.

18  They know exactly where it was.  In addition, you know --

19          THE COURT:  Hang on.  Let me just look at the arrest.

20  That first arrest, the disposition was -- the first arrest

21  listed in the Pretrial Services report was from 1999, January

22  25th and the disposition was June 30, 2009?

23          MR. SANTAMAURO:  I believe so, Judge.  I'm just going

24  to check my records.

25          THE COURT:  I don't quite understand the lapse in

17

1   time.

2           MR. SANTAMAURO:   Judge, what was the date of the

3   arrest?  I'm sorry.

4           THE COURT:  Well, it says the date is January 25th.

5   That's on Page 2 of the Pretrial Service report.

6           FEMALE SPEAKER:  [Inaudible].

7           THE COURT:  The 1999?

8           FEMALE SPEAKER:  1999.

9           THE COURT:  Okay.

10          MR. SANTAMAURO:  Yes, Judge, that's what I believe to

11  be true.  It was 1999.  The disposition was September 1999,

12  Judge.

13          THE COURT:  Okay.

14                  [Pause in proceedings.]

15          THE COURT:  And your proffer on the fact that he had

16  a gun to bring him with the 924(g) is just based on the fact

17  there was source information?

18          MS. ARGENTIERI:  Yeah, Judge.  Two cooperating

19  witnesses who have pled out guilty in federal court say that

20  the night they went to do the robbery he himself didn't have a

21  gun, Judge, the other people who carried out the robbery were

22  armed and he saw the firearm in the car and they talked about

23  how they were going to do the robbery.  They talked about how

24  they were going to wait for someone to come out --

25          THE COURT:  All right.  Okay.  All right.

18

1          MS. ARGENTIERI:  -- because it was a guarded door.

2          THE COURT:  Okay.  So you're relying on that.

3                    [Pause in proceedings.]

4          THE COURT:  I don't think the presumption is

5     applicable.  The presumption under 3142 applies with respect to

6     charges under 924(c) and under the terms of 924(c), he has to

7     carry, use or carry or possess a firearm.

8          MS. ARGENTIERI:  Judge, one could be liable for

9     924(c) if they're not carrying it because under a theory of

10    Pinkerton liability, if it was reasonably foreseeable -- people

11    plead to this and are convicted of it every day in this

12    courthouse.  It's true, Judge, if you -- it's reasonably

13    foreseeable that a firearm will be used, in this case it was

14    because the defendant saw the guns in the car, you're on the

15    hook for the 924(c).  And its charge is also aiding and

16    abetting.  So under that theory the presumption definitely

17    applies.

18         THE COURT:  I'm going to have to continue the

19    hearing.

20         MS. ARGENTIERI:  Okay.

21         THE COURT:  If the presumption applies, then my view

22    might be different but without the presumption I stand by what

23    I said earlier.  We can actually just take a short break and

24    resume at 12 o'clock.

25         MR. SANTAMAURO:  Thank you, Judge.

19

1      MS. ARGENTIERI:  Great.  Thank you, Judge.

2                  [Off the record.]

3      THE CLERK:  Okay.  Second call, USA v. Matthew

4  Rinaldo.  Back on the record.

5      THE COURT:  Good afternoon, both.

6      MR. SANTAMAURO:  Good afternoon, Judge.

7      THE COURT:  I do stand corrected.  Ms. Argentieri is

8  correct that you can be charged and convicted of aiding and

9  abetting under 924(c).  I was a little skeptical in part

10 because that's not mentioned in the complaint and I have no

11 idea that's in fact a charge that the Government intends to

12 present to the jury.  I also tried to research whether or not

13 the fact that one isn't charged with the offense would make a

14 difference.  I think the language of 924 is sufficiently broad

15 and only requires the Court to find that there's probable cause

16 to believe that a person has committed an offense.  I find that

17 based on the proffer of the Government that there is sufficient

18 evidence presented to trigger the presumption in this case.

19      What happens of course under 3142 is it places on the

20 defendant a limited burden of production.  I want to hear from

21 you about how you're going to rebut the presumption that the

22 defendant doesn't pose a danger to the community.

23      MR. SANTAMAURO:  Well, Judge, for one thing, I have

24 affidavits from three of the people who are actually outside

25 stating that they will provide financial assistance to Mr.

1  Rinaldo during this period of time if he is to be released

2  which would in effect prevent him from having to turn to a life

3  of crime to support himself, that being a significant concern.

4          Your Honor, additionally, I believe that once again

5  the fact that these cooperating witnesses have been in custody

6  for so long, that this offense was from 2009, and that the --

7  what I failed to tell you earlier, Your Honor, and I would

8  proffer it now is that Mr. Rinaldo was approached by federal

9  agents in January of 2011 and was released.  So they had an

10  opportunity to have him in custody and keep him in custody and

11  they failed to do so.

12          THE COURT:  That's a risk of flight argument.

13          MR. SANTAMAURO:  Well Judge, but also if he were a

14  danger to the community and this is January 2011, the crime

15  occurrence was '09, the cooperating witnesses were in custody

16  in 2010, apparently the Government left him out essentially for

17  ten months.  So if he is in fact -- I believe that rebuts the

18  presumption that he's a danger to the community because they

19  could have had him in custody this whole time.  So that's the

20  second thing.

21          Additionally, Judge, while you already stated that

22  you believe probable cause has been met, he's not indicted.  It

23  is a complaint.  There are no factual -- there is no factual

24  allegation through testimony.  So I don't know that probable

25  cause has been met at this point, Judge.  And even --

1          THE COURT:  I have to say, even without the proffer

2    from the Government, the fact that he was in the same vehicle

3    and he was the driver of the vehicle with people who were

4    intent on committing a robbery and carrying guns, I cannot

5    believe that he would not have been aware of the existence of

6    the guns.

7          MR. SANTAMAURO:  So noted, Judge.  Judge, I think

8    also there potentially is a jurisdictional issue with respect

9    to this robbery.  It's a robbery of an illegal card game when I

10   think the allegation was it was $3,000.00.  I understand the de

11   minimis standard, but how is this even a federal crime?  I

12   think that should be considered as well.

13         THE COURT:  You don't need to address that.  I don't

14   --

15         MR. SANTAMAURO:  Yes, Judge.

16         THE COURT:  I'm not persuaded by that.

17         MR. SANTAMAURO:  Understood.

18         THE COURT:  And certainly you could have made a

19   motion to dismiss much earlier than this.

20         MR. SANTAMAURO:  Well again, he's not indicted yet,

21   Judge, but I have the affidavits if you would be so -- if you

22   want to see them.  And this is by his girlfriend, mother of his

23   child, and her parents indicating that they would provide

24   financial support for Mr. Rinaldo.

25         THE COURT:  What's the status of the foreclosure

1  proceedings?

2       MR. SANTAMAURO:  The foreclosure proceeding is on his

3  wife's house and they've managed to stave that off.  So they

4  have, it's my understanding they have not actually been served

5  with any foreclosure papers.

6       THE COURT:  Well, the fact that they haven't been

7  served doesn't signify much.  I mean there are now some federal

8  requirements governing foreclosure but I don't think that that

9  would necessarily stop a bank indefinitely from foreclosing and

10 if foreclosure proceedings are brought, where would the

11 defendant reside?

12      MR. SANTAMAURO:  Well Judge, at this point with the

13 Acevedos, Judge, is where he would reside.

14      THE COURT:  All right.  I'll hear from you, Ms.

15 Argentieri.

16      MS. ARGENTIERI:  Judge, just counsel's statement that

17 people have offered to provide for him, this defendant, if he

18 gets out so that he does not have to resort to criminal

19 activity, that in itself is evidence of the proclivity of this

20 defendant because I just return to this, Judge, how has he been

21 supporting himself?  It's through crime, through robberies such

22 as the one that's detailed in the complaint.

23      In addition, these affidavits that these people will

24 support him, that doesn't rebut the violence, Judge.  It

25 doesn't rebut the dangerousness to the community.

1           In addition, I've been given a copy of a January 2010

2    report.  This is from an independent source reported to the

3    police department, this is what I was referring to before,

4    Judge, that the defendant possessed a gun in his residence on

5    Amboy Road.  Now, this is just an additional source, Judge.  I

6    don't know who this person was.  But it corroborates the charge

7    that was set out in the complaint.  And nothing, nothing that

8    defense counsel just said rebuts what you saw in those

9    photographs that this is what the defendant does.  He's driving

10   Anthony Graziano to meet the leadership of the Bonanno Family.

11   This is what he's been doing.  He should, respectfully Judge,

12   be held in custody.

13           THE COURT:  Well, tell me why home detention wouldn't

14   suffice in this case.

15           MS. ARGENTIERI:  Home detention is simply

16   insufficient because we can't monitor him 24/7.  I can't put

17   agents outside his house 24/7 to make sure people aren't going

18   there who aren't supposed to be going there.  And so while I

19   might be able to control where he goes because he doesn't have

20   a job, right, so the home detention doesn't really negatively

21   affect him.  I can't control the amount of cell phones that are

22   brought in and out of the house and I can't control who comes

23   and goes there.  In a case such as this where this defendant is

24   associated with a firearm, robbery, and the Bonanno Family,

25   it's our position that home detention is not sufficient.

24

1          Look at the contacts he has.  You saw a picture of

2 him with the street boss of the Bonanno Family.  I mean these

3 are the types of contacts that this defendant has.

4          THE COURT:  This case -- I am not a great fan of home

5 detention and certainly the Second Circuit in reversing the

6 district court in the [unintelligible] case was not inclined to

7 agree with any creative solutions.  But in this particular case

8 we don't have a defendant who has participated in the actual

9 assault of the victims of the alleged robbery.  That's the main

10 evidence you have on dangerousness and you're dealing with

11 events from two years ago.

12          MS. ARGENTIERI:  But Judge, the notion that he needs

13 to have participated in the actual crime of violence, he did.

14 He was the driver.  How else would they have gotten there?  I

15 mean he didn't actually go in, but that wasn't his role that

16 night.  It very easily could have been his role, but instead

17 his role was to drive.  And he was in a car with people armed

18 with guns, violent people who participated in other robberies.

19 I mean I don't think that anything that Mr. Santamauro just

20 said rebutted the presumption of dangerousness, not the

21 affidavit that he cited.

22          In addition, Judge, look at the contacts for his cell

23 phone.  Who's in here?  Anthony Graziano, Junior, people who

24 are associated with the Bonanno Family.  And given the evidence

25 in this case I don't think that anything cited to you by Mr.

25

1  Santamauro has really rebutted the presumption that he's a

2  danger to the community.

3      MR. SANTAMAURO:  I think it does, Judge, because

4  going forward, going forward if he has the means, if he has a

5  place to live, he has means to support himself if he's on home

6  detention, I don't see how it doesn't rebut it, Judge.  Going

7  forward is what we're talking about as far as him being a

8  danger to the community if he is released, and going forward he

9  will not be a danger to the community.

10      MS. ARGENTIERI:  I don't understand the concept of

11  going forward.  What does that mean?  The defense would concede

12  that as of yesterday he was a danger?  He was driving Mr.

13  Graziano, he was meeting with these people, but now he promises

14  that he won't anymore?  That doesn't make sense to me under the

15  law.  He's presumed to be a danger to the community.  He's

16  charged with a firearm.  He participated in a violent robbery.

17  We have evidence that as of a month ago he was in the company

18  of several members of the Bonanno Family including the street

19  boss.  The going forward notion does not rebut the presumption.

20      THE COURT:  This is a very close case and had the

21  contact with Mr. Graziano occurred earlier, I might be inclined

22  to release him as I'm looking over my notes.  Of course I

23  realize I didn't focus on the fact that the defendant had this

24  contact with Mr. Graziano.  And certainly while it's not proof

25  that he has engaged in crime, certainly given the presumption

26

1   that's in place, it is a factor that weighs into whether or not

2   he does pose a danger to the community.  And as the Second

3   Circuit has recognized, organized crime families do exist and

4   they do pose a danger to the community.

5           So after, as I told you, having found the 924(c)

6   presumption applies, the defendant does have a limited burden

7   of production but not a persuasion.  The burden of persuasion

8   still remains on the Government.  It's to rebut the defendant -

9   - excuse me.  Let me start again.  The defendant does have a

10  limited burden of production to rebut the presumption that he

11  doesn't pose a danger to the community.

12          That being said, and I do think there is something to

13  be said about offsetting one of the factors is lack of

14  employment.  That all goes into the mix of factors that the

15  Court has to consider and weigh.  And I think that the Court

16  still has to determine whether or not the conditions of release

17  will assure the safety of the community.

18          I agree with the defendant the charges in the

19  complaint are more amorphous than usual but I don't think they

20  necessarily reflect a lack of strength in the Government's case

21  because as you well know, many cases in this court are proved

22  by the Government solely with the testimony of cooperating

23  witnesses.  So the offense charged is a crime of violence and

24  robbery and the defendant does have a criminal history.  None

25  of them necessarily involving organized crime but certainly

27

1    they do suggest that he has no means of support, as Ms.

2    Argentieri has pointed out, other than through crime.  And he

3    also, while he does have, apparently has ties with his

4    paramour's family, this relationship is only four -- has only

5    been in existence for four years.  I think that his continuing

6    contact with the Bonanno Family members weighs heavily against

7    him.

8            So I find that the fact that he did have this

9    contact, the fact that the crime alleged in the complaint

10   arises from activities of Bonanno Family members or associates

11   of the Bonanno Family are factors that weigh in favor of the

12   Government in meeting its burden by clear and convincing

13   evidence that the defendant poses a risk of dangerousness to

14   the community.

15           MS. ARGENTIERI:  Thank you, Judge.

16           MR. SANTAMAURO:  Thank you, Your Honor.

17           MS. ARGENTIERI:  So you're entering a permanent order

18   of detention?

19           THE COURT:  I think it's already been entered.

20           MS. ARGENTIERI:  Okay.

21                   *  *  *  *  *  *

22

23

24

25

28

1      I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                                     Mary Greco

7  Dated:   November 22, 2011