EMN:NMA
F.#2011R01798

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                  11-CR-783 (CBA)

MATTHEW RINALDO,

          Defendant.

- - - - - - - - - - - - - - - X


THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR RELEASE ON BAIL PENDING TRIAL


LORETTA E. LYNCH
United States Attorney
Eastern District of New York


NICOLE M. ARGENTIERI
Assistant U.S. Attorney
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

PRELIMINARY STATEMENT

          The government respectfully submits this memorandum in
opposition to the defendant's motion to be released on bail
pending trial.  The defendant – an associate of the Bonanno
organized crime family of La Cosa Nostra (the "Bonanno family") –
now seeks to be released on the basis of the alleged weakness of
the evidence against him and the fact that "Mr. Rinaldo is not []
alleged to be a made member of any organized crime group."  See
Def. Lttr. at 2.  The defendant concedes, as he must, that under
the law, he is presumed to be a danger to the community, and that
it is his burden to rebut this presumption.  The defendant fails
to meet that burden here, where the evidence that he represents a
danger to the community is clear and convincing.  Accordingly,
for the reasons set forth below, the defendant's motion should be
denied.

BACKGROUND

I.   The Defendant's Involvement in Armed Robbery

          On October 24, 2011, the defendant was arrested
pursuant to a complaint filed in the Eastern District of New York
charging Hobbs Act robbery conspiracy, in violation of 18 U.S.C.
§ 1951(a), and a related firearms charge, in violation of 18
U.S.C. § 924(c).  (See Complaint, attached hereto as Exhibit A).
As set forth in the complaint, which is incorporated herein by
reference, two cooperating witnesses ("CW-1" and "CW-2") have

1

advised the government that the defendant was the driver for a 2009 armed robbery of a Bonanno family illegal gambling club.

CW-2 has advised that, in 2009, he and two other co-conspirators agreed to carry out two robberies with Bonanno family associate Hector Pagan, who is also known as "Junior,"[1] and the defendant.[2]  According to CW-2, Pagan introduced the defendant to CW-2 as someone who sold marijuana.  Subsequent to his first meeting the defendant, CW-2 met with the defendant on several occasions to discuss purchasing marijuana from him. According to CW-2, Pagan suggested the robbery of the illegal card game, which CW-2 believed to be operated under the protection of the Bonanno family.  Based upon CW-2's discussions with Pagan, CW-2 expected to rob large sums of money and jewelry from those present at the card game.

CW-2 has further advised that, on the night of the robbery, the defendant agreed to act as the driver and lookout for the armed robbery crew, which consisted of CW-2, Pagan and two other co-conspirators.  CW-2 and the other co-conspirators were visibly armed in the rental vehicle that the defendant drove to the scene of the robbery.  When they arrived at the gambling

---

[1]  On November 21, 2011, Pagan was arrested pursuant to a complaint filed in the Eastern District of New York containing the same charges the defendant faces.

[2]  CW-2 has identified a photograph of the defendant as "Matt," the criminal associate of Pagan's who participated in the armed robbery of the illegal gambling club.

club, Pagan went in first and three others followed, all wearing masks, while the defendant waited outside.  Once inside, CW-2, Pagan and the others threatened the people in the club (approximately eighteen in total) with their firearms and tied them up.  As a result of the robbery, CW-2 estimated they obtained a little over $5,000 and jewelry.

CW-1 has also advised that, at the suggestion of Pagan, he and two other co-conspirators, along with the defendant and Pagan, robbed an illegal card game in 2009.  According to CW-1, the defendant agreed to be the driver and lookout for the robbery.  On the evening of the robbery, the defendant drove CW-1, Pagan and the others, who were visibly armed and prepared with masks, to the location of the illegal card game.  Once inside, CW-1 and the others present used their firearms to threaten the participants in the game to lie down on the floor and empty their pockets.  CW-1 estimated that they took around $3,000 from the approximately sixteen individuals present during the robbery.

The information provided by CW-1 and CW-2 is also corroborated by the defendant's own statements, recorded during prison calls since his arrest.  For example, on October 26, 2011, the defendant spoke to Pagan, his co-conspirator in the charged criminal conduct, and they had the following discussion:

Pagan:          Hey pal.

Defendant:      Hey, what's up there buddy boy?

3

Pagan:          What are ya doing?

Defendant:      What am I doing?  I'm sitting in intake.

Pagan:          You're still in intake?

Defendant:      Yeah, holmes, I'm still here bro.

Pagan:          Fuck man, it's taking forever to get you up there.

Defendant:      Well, I didn't even go to, I didn't even see medical yet man, but Joey Petillo's here.

Pagan:          Yeah.  Oh, Joey Petillo got locked up?

Defendant:      Yeah.  He got, he got grabbed the other day.  He was, he just got grabbed on something from ten years ago.

Pagan:          Yeah.

Defendant:      Uh.  And then a coupla guys across the hall, Neil ( a reference to Gambino soldier Neil Lombardo) - they sent me over some stuff, ya know?  They're taking care of me. People (UI)

Pagan:          Yeah.

Defendant:      Alright.

Pagan:          Alright, so, they, they pretty much explained to me everything that's going on, what's gonna happen-

Defendant:      Yeah, yeah, yeah.  And um, you know I guess you, I guess you know what's going on, right?

Pagan:          Yeah, I, I know what you're pinched for, but that's not stuff that's really going on, you know what I mean?

Defendant:      Uh, huh.  Alright.

Pagan:          We'll find out at bail, I guess.

4

Defendant:     What?

Pagan:         We'll find out when your bail hearing comes up.

Defendant:     Alright, there's more?

Pagan:         Well, no normally what they do is they give ya a little charge and then tell you you're a menace to society, then they hit you with a superseding indictment, and then that brings you where you can't get no bail.

Defendant:     Well, they told my lawyer that.  They told my lawyer that that could possibly be what's gonna happen.  But there's nothing else- you know what I mean?  I didn't even do what they're saying I did.  You know what I mean?

Pagan:         No, I know that.

Defendant:     It's fucking bullshit.

Pagan:         No, I know.

Defendant:     But, don't you know, she don't know nothing about numbers and what it is.  You know what I mean?

Pagan:         Yeah, yeah. No, it's good just to talk to her, let her know I'm here, and uh, whatever.

Defendant:     But, uh, what was I gonna say?  Did they, did they talk to you a year ago like this?

Pagan:         Did they?  Yeah.

Defendant:     They did? I didn't know that.  I didn't know that.  Alright.

Pagan:         Well, no.  They spoke to my attorney.

Defendant:     Oh, okay.  Alright, okay.

5

(See 10/26/11 recording, attached as Exhibit B).[3]

Thereafter, on October 27, 2011, the defendant told his girlfriend about Pagan:

> I don't care, I'll fuckin go to trial.  I don't care, this. I don't care.  I don't, don't care at this point.  I don't care.  Because, you know what, if Junior, if Junior did fucking- cause there's a reason why he's not here.  I don't know what the fuck it is, but there's a reason he's not here with me, you understand?  Because everyone's talking about him in here, everyone's talking about the show and all this bullshit, you know what I mean.  So if I take it to trial all that shits gotta come out, whoever said anything, whoever talked, whoever said anything, it's all gotta come out.  And let them be exposed.  I don't give a fuck.

(See 10/27/11 recording, attached as Exhibit C).  In other recordings, including on October 27, 2011 and thereafter, the defendant repeatedly warned his girlfriend not to speak to Pagan, who he believes to be cooperating with law enforcement.

Taken together, these statements plainly constitute veiled admissions.  For example, when the defendant said to Pagan, supra, "I guess you know what's going on, right?", the defendant was referring to the fact that Pagan knew what he was charged with because they participated in the robbery together. Similarly, when the defendant confronted Pagan about being asked about the robbery a year ago by law enforcement, his tone clearly indicated that he was upset that Pagan didn't tell him about

---

[3]  All transcripts are submitted in relevant part, and in draft form and are subject to change.

being confronted, which would only make sense if they committed the robbery together.

Finally, the clear implication of the defendant's statement a day later to his girlfriend "there's a reason he's not in here with me," is that the defendant believed Pagan to be cooperating with the government because both he and Pagan had participated in the robbery, but only the defendant had been arrested.   Taken together, these statements are powerful additional evidence of the defendant's guilt of the charged crime.

II.   The Defendant's Involvement in Burglary

Both CW-1 and CW-2 have advised that they participated in a burglary in 2009 with Pagan and the defendant.   According to CW-2, Pagan suggested that they rob John Doe, an individual believed to possess a significant amount of money from his business at his residence.   CW-2 has advised that John Doe resided in Captain's Quarters, a residential apartment complex located in Staten Island, New York.   According to CW-2, Pagan insisted that the defendant participate in the robbery on Pagan's behalf.   At the appointed date and time, the defendant, CW-2 and two other co-conspirators broke John Doe's front door in and went in, but they did not find any money.   CW-2 stated that one of his co-conspirators stole a watch and jewelry, but they lied to Pagan about that and hid it from the defendant because they were upset

7

that there was no money to rob.  According to CW-2, he and the
two other co-conspirators did not like the way the defendant
conducted himself during the robbery, saying the defendant, in
sum and substance, "froze" when it was time to get out of the
car.  As a result, when the time came to carry out the robbery of
the illegal gambling club, CW-2 and the other co-conspirators
insisted that the defendant participate solely as the driver.
CW-2 advised that during his interactions with the defendant, the
defendant repeatedly bragged about his participation in other
criminal acts, including robbery and narcotics trafficking,
saying, in sum and substance, "This is what I do."

        CW-1 also advised that the defendant participated in
the burglary of John Doe's residence.  CW-1 stated that the
defendant, along with two other co-conspirators and CW-1, broke
into John Doe's house, which was located in the Captain's
Quarters apartment complex in Staten Island, New York.  According
to CW-1, one of the co-conspirators stole a watch and jewelry,
but there was no money to rob.  CW-1 also advised that he and the
other co-conspirators were unhappy with how the defendant handled
himself during the burglary.

III. The Defendant's Participation in the Bonanno Family

        The defendant is an associate of the Bonanno family, a
violent criminal organization.  Along with Pagan, the defendant
has been assigned to Bonanno family captain and former acting

consigliere Anthony Graziano, who is also known as "TG."  Before
his recent re-arrest, Graziano had been living in a halfway
house.  Since August 2011, the defendant was surveilled by law
enforcement agents driving Graziano to meet with other members
and associates of the Bonanno family.  For example, on September
6, 2011, Special Agents of the Drug Enforcement Administration
("DEA") observed the defendant with Graziano and Bonanno family
associate Eddie Cappucci outside Synergy Gym in Staten Island,
New York.  Agents observed Graziano meeting with Cappucci and
then shortly thereafter leaving in a vehicle driven by the
defendant.  On September 9, 2011, agents observed the defendant
drive Graziano to a diner in Staten Island, New York, at which
time the defendant and Graziano entered the diner.  Approximately
half an hour later, agents observed Bonanno family captain
Nicholas Santora exit the diner, and, minutes after that,
observed Graziano and the defendant leaving the diner.  On
October 18, 2011, agents observed Bonanno family street boss
Vincent Badalamenti, also known as "Vinny TV," and Bonanno family
soldiers Vito Balsamo and Arthur Tarzia, also known as "Fat
Artie," meeting with Graziano and the defendant at a restaurant
in Staten Island, New York.  Photographs were taken when the
group left the restaurant, which are attached as Exhibit D.

Additionally, since the defendant's incarceration, he
has called Graziano on the telephone and urged his girlfriend to

"stay close" to Graziano and his family, telling her to stay in touch with Graziano's wife and Graziano.  He has also been recorded bragging to his wife and to Graziano about his organized crime-affiliated fellow prisoners, including Gambino soldiers Angelo Ruggiero and Neil Lombardo, former Colombo family street boss Thomas Gioeli and former Colombo family administration member Joel Cacace.

ARGUMENT

I.  <u>Applicable Law</u>

The Bail Reform Act empowers federal courts to order a defendant's detention pending trial where the government establishes by clear and convincing evidence that the defendant is a danger to the community or, by a preponderance of the evidence, that he represents a risk of flight.  <u>See</u> 18 U.S.C. § 3142(e); <u>United States v. Ferranti</u>, 66 F.3d 540, 542 (2d Cir. 1995); <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987). However, where, as here, there is probable cause to believe that an individual committed "an offense under 924(c)," it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.  <u>See</u> 18 U.S.C. § 3142(e)(3)(B).[4] Moreover, it is well established that even if a defendant can

---

[4]  Courts have held that where a defendant has already been indicted for such an offense, the grand jury has already found probable cause sufficient to trigger the presumption.  <u>See</u> <u>United States v. Rodriguez</u>, 950 F.2d 85, 87 (2d Cir. 1991).

10

meet his burden to rebut this presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight, the presumption favoring detention "does not disappear entirely, but remains a factor to be considered among those weighed by the district court."  See United States v. Mercedes, 254 F.3d 433 (2d Cir. 2001); see also United States v. Martir, 782 F.2d 1141, 1144 (2d Cir. 1986) (presumption of risk of flight); Rodriguez, 950 F.2d at 88 (presumption of dangerousness).

In order to determine whether the presumptions of dangerousness and flight are rebutted, the district court is directed to consider the factors enumerated in 18 U.S.C. § 3142(g), specifically: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including family ties, employment, community ties and past conduct; and (4) the nature and seriousness of the danger posed by the defendant's release.

Evidentiary rules concerning admissibility do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also Fed. R. Evid. 1101(d)(3); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).  In

11

Martir, the Court of Appeals held that the government should be able to proceed in bail hearings by way of proffers rather than full-blown evidentiary hearings.  782 F.2d at 1145.[5]

II.  Analysis

       The defendant has failed to rebut the presumption that he represents a danger to the community.  Instead, he cites to (1) the alleged weakness of the government's case and (2) the "substantial" nature of the proposed bond.  Not one argument advanced by the defendant - alone or taken together with the others - succeeds in rebutting the presumption in this case. Given his involvement in violent criminal conduct - an armed robbery - and his continued association since his arrest with a notoriously violent racketeering enterprise, the Court should enter a permanent order of detention.  Accordingly, the defendant's motion should be denied.

    A.   The Applicable Factors Favor Detention

       All four applicable factors favor detention in this case.

---

[5] Every other circuit to have considered the matter has also rejected claims that the government is required to present live testimony in support of applications for detention.  United States v. Smith, 79 F.3d 1208 (D.C. Cir. 1996); United States v. Gaviria, 828 F.2d 667, 669 (11th Cir. 1987); United States v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986); United States v. Acevedo-Ramos, 755 F.2d 203, 206-07 (1st Cir. 1985).  See also United States v. Salerno, 481 U.S. 739, 743 (1987) (government relied on lengthy proffer derived from electronic surveillance and anticipated testimony for pretrial detention hearing).

1.   <u>Nature and Circumstances of the Crime Charged</u>

The nature and circumstances of the crimes charged are serious.  The defendant was the driver and lookout for an armed crew of men who had agreed to rob an illegal gambling club associated with the Bonanno family.  The defendant and his co-conspirators believed a large number of individuals would be present at the card game, such that the robbery would be lucrative.  The defendant and his co-conspirators also agreed that the robbery would be carried out at gunpoint; indeed, at least two members of the conspiracy were visibly armed in the car the defendant drove to the robbery location.  By agreeing to this course of action, and aiding and abetting the robbery, the defendant put many lives at risk, not the least of which were the numerous victims who were tied up inside the gambling club.  If convicted, the defendant faces a potential mandatory minimum sentence of seven years' imprisonment on the firearms charges alone.  The potential for such a lengthy prison sentence creates an incentive for the defendant to attempt to tamper with witnesses.  <u>See</u> <u>United States v. Streater</u>, 1999 WL 1067837, at *6 (D. Conn. Nov. 5, 1999) (finding based upon government's proffer of defendant's alleged witness tampering and violent history that his release would expose potential witnesses to inordinate risk of threats).

13

2.   The Weight of the Evidence

The weight of the evidence against the defendant is strong.  Two cooperating witnesses are expected to testify about the defendant's participation in the robbery, which is corroborated, as set forth above, by the defendant's own statements.

The defendant has utterly failed to rebut the presumption of dangerousness by addressing the government's evidence.  He does nothing more than characterize conclusorily the case against him as "not strong" and challenge the government's witnesses because they are criminals cooperating in the hopes of obtaining leniency at sentencing.  Def. Lttr. at 2. These arguments do not address the statements made by the government's witnesses - both of whom are expected to testify under oath about the defendant's participation in the armed robbery.  The defendant does not explain - because he cannot - how he was acquainted with these individuals, or the nature of his business dealings with them.  Moreover, the defendant - incorrectly - advises the Court that he has no criminal history. A review of the defendant's rap sheet indicates the following convictions:

- • 2008 misdemeanor conviction for assault in the third degree in Richmond County Criminal Court, for which he was sentenced to 20 days' incarceration;[6]

---

[6] This contradicts the defendant's claim that he was never incarcerated.  See Def. Lttr. at 2.

14

- 2008 felony conviction for receipt of stolen property in Monmouth County Superior Court, for which he was sentenced to 9 days of jailtime credit; and

- 1999 felony conviction for attempted criminal sale of a controlled substance in Richmond County Supreme Court, for which he was sentenced to five years' probation.

3.   The Defendant's History and Characteristics

As set forth above, the defendant is an individual with a serious criminal history who is associated with the Bonanno family.  Perhaps the most significant evidence of this defendant's character and criminal proclivities consists of the surveillances set forth above, which demonstrate that the defendant aided and abetted Graziano's successful attempts - while living in a halfway house - to meet with other high-ranking members of the Bonanno family and carry out criminal activities. The tape recordings of the defendant bragging about his fellow prisoners and their association with organized crime similarly demonstrates that, even now, this defendant will not be dissuaded from continuing his criminal associations.  For example, on October 28, 2011, the defendant called Bonanno family associate Mark Larotonda, telling him that he is being held with Larotonda's old friend Gambino family soldier Angelo Ruggiero. (See 10/28/11 recording, attached as Exhibit E).  During that same conversation, the defendant subsequently told Larotonda, "I thought, you know, a couple guys asked, I said I was, ya know, I said I was 'this guy's' friend [a reference to Graziano] or

15

whatever."

Notably, the defendant is not requesting bail so that he can continue some lawful employment and contribute to his family's livelihood.  To the contrary, the defendant indicated to Pretrial Services that he has not been employed in many years and that he is not currently receiving disability.  These facts beg the question - how has the defendant and his family survived financially for the last five years?  According to at least one cooperating witness and at least two confidential sources, the defendant makes money from selling marijuana and bookmaking. This information is corroborated by his recorded prison calls with his girlfriend Candace, in which the defendant repeatedly asked about his two friends (individuals named Joe and Tom) and money they are supposed to give her.  For example, on October 27, 2011, Candace told him, "I spoke to Tom yesterday, he's going to give me money every month."  During an October 31, 2011 recorded call, the defendant told Candace of Tom and Joe:

Defendant: I'm talking about my other two friends.

Candace:  Yeah.  I'll tell them.

Defendant: Just tell them, say, "listen, you know, you know
           he's strong, he loves you guys and you know, he
           just hopes that, you know, that, you know, that
           his family's okay, you know, that's all."

(See 10/31/11 recording, attached as Exhibit F).  Thereafter, on a November 1, 2011 recorded call, in response to the defendant's request for Candace to put more money in his commissary account,

16

Candace told the defendant that money was "tight" and the defendant stated, "I thought they gave you $1,000 the other day?" (See 11/1/11 recording, attached as Exhibit G).  These conversations, when considered with the complete lack of recent and not so recent employment history, support the notion that the defendant profits from illegal activity and that he will try to continue to do so if released on bail.  The personal history and characteristics of this defendant thus weigh heavily in favor of detention.

### 4.   The Danger Posed by the Defendant's Release

The danger posed by the defendant's release is clear and present.  Put simply, the defendant has nothing left to lose. Given the circumstances of this case, the defendant is now presumably aware of the identities of the witnesses - government cooperators - who are providing information about his criminal past.  The defendant thus has a strong incentive to try to find and intimidate the witnesses against him, including the families and friends of those cooperating witnesses.  Indeed, following the defendant's initial detention hearing, the Honorable Marilyn D. Go, United States Magistrate Judge for the Eastern District of New York, found that the defendant's bail package, which included property and many sureties, was insufficient to overcome the presumption and entered an order of detention.  (See Transcript of Detention Hearing, at 27, attached hereto as Exhibit H).

17

Magistrate Judge Go was particularly persuaded by the defendant's continuing contact with the Bonanno family, which the court found weighed heavily against him.  Id.  Additionally, as set forth above, the personal circumstances of this defendant make it very likely that he will continue to commit crimes if released upon bail.  See United States v. Colombo, 777 F.2d 96,98 (2d Cir. 1985) ("Congress has expressed its concern about 'the growing problem of crimes committed by persons on release . . .'"); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (finding organized crime defendants represent a danger to the community based upon, among other things, the nature of their illegal activities) ("When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident . . .").  As an associate of the Bonanno family eager to ingratiate himself with its leadership and an unemployed criminal used to making money from illegal activities including bookmaking and narcotics trafficking, the defendant will likely to continue to commit racketeering-related crimes while on release, which would certainly endanger the community.

Given the nature of the charged crime and the defendant's past participation in violent crimes, a large bond cannot mitigate the very real threat that the defendant poses. Travel restrictions and the posting of collateral "tends merely

18

to assure that he will not flee and does not relate to protection of the community." Colombo, 777 F.2d at 100; Ferranti, 66 F.3d at 543 ("$1,000,000 bond would have deterred flight, not danger."). The Court of Appeals has expressly held that a bail package that might "reasonably assure the appearance of [the defendant] at trial, will not reasonably assure the safety of the community." Mercedes, 254 F.3d at 437.

In Mercedes, the Second Circuit reversed a district court's order releasing of defendants on bail pending trial, holding that the defendants failed to rebut the statutory presumption of dangerousness. Id. There, defendant Roman, for example, who was charged with conspiracy to commit the armed robbery of a drug dealer, was present in the car with loaded guns, among other things, and had two prior convictions for weapons possession, one misdemeanor and one felony. Id. Here, the defendant is also charged with conspiracy to commit armed robbery, was also present in the car with loaded guns and also has prior convictions, including for assault and narcotics trafficking. Additionally, unlike Roman, the defendant here is not employed and does not have strong ties to his suretors, who are all close relatives of his girlfriend. Indeed, it is notable that not one potential surety is related to this defendant.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendant has failed to rebut the presumption of dangerousness that applies in this case based upon the nature of the charged crime - a presumption that the government has supported through clear and convincing evidence - and that his appeal of Magistrate Judge Go's order entering a permanent order of detention should be denied.

Dated:     Brooklyn, New York
           December 6, 2011

                              Respectfully submitted,
                              LORETTA E. LYNCH
                              United States Attorney


                    By:    <u>/s Nicole M. Argentieri</u>
                           Nicole M. Argentieri
                           Assistant U.S. Attorney
                           (718) 254-6232

cc:  James Froccaro, Esq. (By ECF)
     Clerk of Court (CBA) (By ECF)(w/o encls.)